IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

VICTORIA DIVISION

| | |
|---|---|
| MISTY VALLADARES, . | CIVIL ACTION NO.: |
| . | 6:24-CV-00012 |
| Plaintiff, . | |
| . | VICTORIA, TEXAS |
| vs. . | |
| . | August 5, 2025 |
| WAL-MART STORES TEXAS, LLC, . | |
| ET AL, . | 2:11 p.m. |
| . | |
| Defendant. . | |
| . | |
| . . . . . . . . . . . . . . . | |

DEPOSITION OF

DR. MOBEEN CHOUDHRI, MD

Taken by the Plaintiff

JESSICA GANCI, CER 134357907
Esquire Deposition Solutions

Proceedings recorded by a reporter using electronic sound recording; transcript produced by the reporter and transcriber.



EXHIBIT C

APPEARANCES OF COUNSEL

On behalf of MISTY VALLADARES:

    EVAN ANDERS, ESQ.
    WILLIAM L. SCIBA, III, ESQ.
    COLE, COLE, EASLEY & SCIBA, P.C.
    302 West Forrest Street
    Victoria, Texas 77901
    361-575-0551
    evan@colefirmservice.com

On behalf of WAL-MART STORES TEXAS, LLC:

    ALICIA K. PATTERSON, ESQ.
    BUSH & RAMIREZ, PLLC
    5615 Kirby Drive
    Suite 900
    Houston, Texas 77005
    713-626-1555
    apatterson@bushramirez.com

Also present:

    Tommy Henry, Videographer



EXHIBIT C

INDEX TO EXAMINATION

EXAMINATION                                              PAGE

Examination by Mr. Anders                                5

Examination by Mr. Patterson                            51

Examination by Mr. Anders                                94


INDEX OF EXHIBITS

PLAINTIFF'S    DESCRIPTION                              PAGE

Exhibit 1      Dr. Choudhri CV                          7

Exhibit 2      Visit Notes                              12

Exhibit 3      Medical Bill Summary                     41

Exhibit 4      Designation of Expert Witness            52


        (Exhibits 1 through 4 were attached to the original transcript.)



EXHIBIT C

BY MR. ANDERS:

Q.    Can you please state your name for the record?

A.    Do I need to spell it?

Q.    Sure.

A.    Okay.  M-O-B-E-E-N.  Last name Choudhri, C-H-O-U-D-H-R-I.

Q.    Okay.

A.    Mobeen Choudhri.

Q.    Okay.  Dr. Choudhri, what do you do?

A.    I'm a pain management physician.

Q.    Okay.  And what is the practice of pain management?

A.    So we have an interventional pain medicine practice.  Which we do -- we treat multiple pathologies from the spine to joints, and we do interventions as well as do med management.  And we treat and diagnose chronic as well as acute pain diagnosis.

Q.    Okay.  What type of patients do you see on the day to day?

A.    We see spine patients.  We see joint arthritis patients.  We see injury patients.  We see spinal cord injury, stroke.  Oh my God, so many.  Arthritis, rheumatoid, chronic neuropathic pain.  Very multiple kinds of specialties.  All -- most -- we're a specialist, so mostly primary care doctors and surgeons send us patients.



EXHIBIT C

Q.   Okay.  How long have you been a pain management treatment provider?

A.   I graduated from a fellowship in 2006, and I've been doing pain management since 2006 to current.  So almost 10 years.  Well, sorry, not 10, 20 years.

Q.   Is your license to practice medicine on file with the appropriate authorities in the state of Texas?

A.   Yes.

Q.   Okay.  Do -- do you have any board certifications?

A.   Yes.  I'm board certified in physical medicine and rehabilitation, which was my specialty.  And then I'm also board certified in pain management.  I reboarded in 20 -- 20 -- 2020.  So board was 2009 and reboarded in 2000 and -- 10 years later or whatever that is.  2019 or 2020.  And so I'm board certified in both of them, pain and physical medicine rehabilitation, which is PM&R.

          MR. ANDERS:  Okay.  All right.  I'm going to show you what we'll mark as Plaintiff's Exhibit 1.

     (Exhibit 1 was marked for identification.)

BY MR. ANDERS:

Q.   What am I -- what are you looking at?  If you can see that?

A.   That's my CV.

Q.   Okay.  And let the record reflect there's three pages to this.



EXHIBIT C

Does this -- does this accurately reflect your training and experience?

A.   Yes.  I've been in Houston since 2009.  And I did my training in 2006, I completed it.  So yeah, that's correct.

Q.   Okay.  And so -- and is it up to date?

A.   Yes.

Q.   Okay.  Put that -- okay.  All right.  I'm going to ask you a -- a couple of questions about your opinion on some matters and I would ask that you give me a commitment that you would limit your opinions to a reasonable degree of medical probability.  Will you agree to do that?

A.   I do.

Q.   Okay.  And so have you ever had the opportunity to see, care, and treat Ms. Misty Valladares?

A.   Yes.

Q.   Okay.  And can you tell me a little bit about that?

A.   So she started seeing us earlier in -- I can't remember exactly when.  But she started seeing us around March or April and she was seeing our -- our practice. She initially saw me and my partner, as well as my nurse practitioner.  We've done multiple injections on her. And we've also been managing her pain medications and we've been treating her for her neck.  She was also



EXHIBIT C

seeing us before that for her ankle, which is a separate situation.

Q.   Okay.  And -- and was she seeing you for her ankle before March of '24?

A.   Correct, yes.

Q.   Okay.  And so do you know how long she was seeing you for her ankle?

A.   I think she was seeing us, I want to say since 2019.  So for a while.

Q.   Okay. All right.  All right.  So just to make sure I understand, she -- you were seeing her in 2019 for an ankle problem.  And then in 2024, sometime in 2024, early, she comes to you with -- with another problem; is that right?

A.   Correct.

Q.   Okay. All right.  Let me share my screen.  Yeah. Okay.  And I'm -- set on Zoom.

A.   Is it okay if I use my computer to look at the chart?

Q.   Yes.

A.   Okay.  Just wanted to make sure.

Q.   Yes.  For sure.  So -- so I'm -- I'm -- I've got what appears to be March of 2021 -- I mean, a March 21st, 2024 medical record of yours.

A.   Okay.



800.211.DEPO (3376)
EsquireSolutions.com

EXHIBIT C

A.   Yes.  So at the assessment and plan when we evaluated her, we gave her a diagnosis of cervical disk displacement and cervical radiculopathy because she had physical exam findings consistent with radiculopathy, she had sensory loss -- I'm sorry, motor loss on physical exam, which is objective.  But then she was also complaining of numbing and tingling, which is subjective.

So based on the fact that we had multiple herniated discs, we had a physical exam finding consistent with that.  And it's kind of like the -- like, you know, putting everything together.  You -- you see what patient's done conservatively.  She's done therapy. She's done almost two months of therapy.  She was complaining of headaches, which can be also consistent with radiculopathy.  We documented her to have a cervical radiculopathy and ordered a cervical epidural steroid injection.

Q.   Okay.  So -- so based on what you learned, in your medical opinion, did Ms. Valladares sustain an injury on January 1st, 2024 at Walmart?

A.   Yeah, because she did not have any pain prior to that injury, she never complained about it to us and we were seeing her before that, too.  She was not even getting treated for her cervical spine.



EXHIBIT C

over time, whatever is not fused is going to overwork and what we call wear and tear.  And so she might need treatment for the adjacent level.  Like, C2, C3, she could have -- which is where the headaches are coming from, that could cause pain over time and she would have headaches on and off.  It just -- and she's got a limited range of motion now because she's got a big fusion.

So the prognosis is fair to guarded, I would say. I mean, she's -- she's going to live her life.  It's not like she's going to be miserable for the rest of her life.  She'll just have pain that's chronic.  And it's going to have, like, its ebbs and flows.  So she's -- she's going to -- she's going to have a fair prognosis. I think she's not going to be fully recovered.  There's no guarantee with that.  I -- I can't really comment on our surgical stuff, but she's still having pain after her surgery, so -- we do see patients with that.

Q.   Okay.  Thank you.  Will she, in your opinion, require medical care in the future?

A.   I think she will.

MS. PATTERSON:  Form.

BY MR. ANDERS:

Q.   Okay.  Do you have an opinion as to what the likely cost of that future medical care is?



EXHIBIT C

A.    So based on what I have treated her for, I've treated her -- like, I'll give you kind of a list of -- I've done two epidural steroid injections for her, so she might need a repeat epidural.  We -- I don't recommend more than three epidural injections in one year.  So those, she might need those on and off.  It all depends on if she has some kind of, like, irritation or inflammation.  She might also stop responding to the epidural injections, which I can't -- like, that's kind of what happened with her and so that's why we had to send her to the surgeon.  And she might need an extension of her surgery.  Again, I -- I can't guess on that.

She will probably need RFAs.  Usually, the radio frequency ablation or the rhizotomies last six months to a year.  Sometimes they last two years.  With her, they're lasting about six months to nine months because the nerves regenerate.  So she'll need an average of two RFAs a year.  I'm not saying she'll need it for the rest of her life.  She might need it once a year.  Maybe she'll start getting better and she might need it maybe more often.  As time goes by, the other joints that are overworked, she might need treatment for that.  So she might need radiofrequency ablation once a year to twice a year.



EXHIBIT C

Other than that, I can't really comment on surgery. You know, other part that has not been stabilized could be destabilized over time. Five years, six years. That's more of a surgeon's comment to do that, but she will probably need cervical epidurals on and off. She will need medications on and off. And long term, let's say she continues to have a lot of nerve pain that's related to the -- the permanent damage. Even though she's surgically decompressed, you could have nerve damage that's indefinite. We do what we call neuro -- dorsal column stimulators, which is called spinal cord stimulators. She might need that. And again, this is the worst case scenario; she's still in pain for the rest of her life. She might need a pain pump.

Q.   Okay.  And do you know the approximate costs of those -- those treatments?

A.   So I was trying to figure that out and -- and, like, I was just trying to figure out the logistics of, like, what -- I usually don't do the numbers. So I was talking to my billing department about what that is and, like, cervical epidurals can cost -- and I don't want to give you the wrong information. I was looking at that. This is -- let me look at it.

So like, a cervical epidural can cost as much as -- let's see. As much as -- with anesthesia, let's say



EXHIBIT C

about three times a year, it can cost $3,500 per injection.  And let's say she needs a max of three.  So that's how much a cervical epidural would cost with anesthesia that's at a surgical facility.  A radiofrequency ablation with anesthesia, like I said, an average of about two a year can cost about 17,000.  That's at the hospital level.  So two a year average.  Again, maybe one a year.

We talked about Botox.  She actually did really well with the Botox because she ended up having a lot of really -- people develop what we call dystonia, and that's just a fancy word for saying tightness in the neck muscles because now they've lost their mobility, because she had cervical fusion.  So I give her a -- a diagnosis of dystonia as well recently.  And that's Botox and that costs about -- you do -- Botox lasts about three months.  So each Botox treatment is about 1,500.  And if you do about four a year, that's about -- I don't know.  Do the math.  1,500 or -- so about 6,000 a year.

What else?  I mean, I can go into details about a spinal cord stimulator trial.  Again, I don't know if she'll need it or not.  She might not.  She might just do well.  I don't know.  But she's continually getting treatment ever since she's had even the neck surgery.



EXHIBIT C

She has different pain after the neck surgery.  She has more like spasms, range of motion limitation.  She's not going to be able to move that part of her neck ever again.  You know, it's -- it's fused.

Q.   Okay.

A.   So that's where she's going to have some, what we call, dystonia.

Q.   Okay.  And so how much -- how much are we looking at if in the event she needs a spinal cord stimulator trial?

A.   So a spinal cord stimulator at a hospital facility is about 99,000.  A spinal cord stimulator implant, which is like a lithium battery, they last about ten years.  Those are about 198,000.  And then if she -- let's say she needs a pump.  So we do a pump trial.  Pump trial is about 3,500.  And a pump implant, it's like -- you -- you -- the battery dies after ten years.  So it's 140,000.

So let's say she lives about 25 years, you know, her life expectancy.  She's 57 right now.  She will need probably two pain pumps in her lifetime and probably two stimulators in her lifetime.  So a spinal cord stimulator implant, if it's 198, just multiply it times two.  And if it's a pump implant, it's 140, and then just multiply it times two.  So with that, with the --



EXHIBIT C

all the procedures I listed, it can be a range of -- it -- just -- you know, I'm just talking about hospital base.  It could be a range of -- combined of 25 years of treatment of injections, radio frequencies, epidurals, stimulator, about 1.4 million lifetime procedures.  This is just procedures only.

Q.   Okay.

A.   If it's -- she's getting it for that.  That doesn't include neck surgery or anything like that.

            MR. ANDERS:  Okay.  Allie, is it about that time?

            MS. PATTERSON:  Yep.  Yeah.  If we could take a break, that'd be great.

            MR. ANDERS:  I could go too, so --

            MS. PATTERSON:  Okay.  Thanks.

            MR. ANDERS:  Thanks.

            THE WITNESS:  So what -- do we stay in this -- and we just took a break, like --

            MR. ANDERS:  Oh, we -- we can take a break.  Let's do five -- ten -- five minutes.  Is that good with you, Allie?

            MS. PATTERSON:  Five is fine.  Yeah.

            MR. ANDERS:  Okay.  We'll do five minutes and then, yeah, I'll just see you then.

            MS. PATTERSON:  Okay.



EXHIBIT C

THE REPORTER:  All right.

THE VIDEOGRAPHER:  The time is 2:59 and we'll be off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 3:08.  We'll be back on the -- oh, sorry.  3:08, and we'll be back on the record.

BY MR. ANDERS:

Q.   Dr. Choudhri, the medical futures that you just testified to, are they necessary to treat the injury that Ms. Valladares sustained on January 1st, 2024 at Walmart?

A.   Well, based on what she's done so far, I feel like that's necessary because that's what she's responding to and that's what's happening.  And I -- I -- I just don't know how long she's going to need it, but that's just my estimation.

Q.   Okay.  Thank you.

MR. ANDERS:  I'm going to mark another exhibit here.  Okay.  I'm showing you what we'll mark as Plaintiff's Exhibit 3.

(Exhibit 3 was marked for identification.)

BY MR. ANDERS:

Q.   It's Valladares 1107 through 1110.  It's a summary of medical bills and treatment.  Have you had a



EXHIBIT C

chance -- Dr. Choudhri, have you had a chance to look through this document?

A.   I don't think I looked at this one.

Q.   Okay.

A.   It might have been some of the stuff that I looked at, but I'm looking at it right now.

Q.   Okay.

A.   Okay.

Q.   In your opinion, was the -- was the care provided by Memorial Medical Center necessary to treat the injury Ms. Valladares sustained at Walmart on January 1st of 2024?

           MS. PATTERSON:  Scope.

           You can answer.

           THE WITNESS:  Yeah.  It looks like it's appropriate because she had x-rays, she had therapy. That's what I would've probably recommended too, initially after an injury.

BY MR. ANDERS:

Q.   Okay.  And would it be reasonable for her to get chiropractic therapy after an injury like this?

A.   Yeah.  It just depends on, like, what she was responding to.  So chiropractics also do physical therapy.  So it says chiropractic and PT exercises.  So I mean, at this point, the therapy was recommended, so



EXHIBIT C

she did get that.

Q.   Okay.  And -- and so you believe that was necessary to treat the injury Ms. Valladares sustained on January 1st of 2024?

MS. PATTERSON:  Objection.  Scope.

THE WITNESS:  Yeah.  I would --

MS. PATTERSON:  You can answer.

THE WITNESS:  I would recommend therapy after any kind of injury like that.  Yeah.

BY MR. ANDERS:

Q.   Okay.  Same question.  So in your opinion, was the care provided by Victoria MRI Imaging on February 8th of '24 necessary to treat Ms. -- treat the injury Ms. Valladares sustained at Walmart on January 1st of 2024?

MS. PATTERSON:  Objection.  Scope.

You can answer.

THE WITNESS:  Yeah.  So I think we ordered -- or someone ordered the MRI.  We would need the MRI to find out what's going on with her.  So I think the MRI was indicated, yes.

BY MR. ANDERS:

Q.   Okay.  And then in your opinion, was the care provided by Memorial Medical Clinic -- that would be her PCP -- necessary to treat the injury Ms. Valladares sustained at Walmart on January 1st of 2024?



MS. PATTERSON:  Objection.  Scope.

THE WITNESS:  Yeah.  It was her initial intake, so I'm assuming yes.

BY MR. ANDERS:

Q.   Okay.  And then this is you, Dr. Choudhri, right?

A.   Yes.

Q.   Okay.  And so we've got some -- some treatment dates here.  In your opinion, was the care provided by you necessary to treat the injury Ms. Valladares sustained at Walmart on January 1st of 2024?

A.   Yes.  Because every time she was seen, there was something, like, documented why she was seen.  She was seen initially, and then follow up, and then injection. And so each treatment was indicated based on a clinical evaluation.

Q.   And for -- for your bills, in your opinion, are your medical bills usual and customary for the medical market in Victoria, Texas?

A.   Yes.

Q.   Okay.  And in your opinion, was the care provided by Crossroads Surgery Center necessary to treat the injury Ms. Valladares sustained at Walmart on January 1st of 2024?

MS. PATTERSON:  Objection.  Scope.

THE WITNESS:  Yeah.  So she ended up having



EXHIBIT C

her procedures with anesthesia.  So that's where her --
that's the facility that we do our procedures.  Her RFA,
everything was done at that facility.  Correct.

BY MR. ANDERS:

Q.   Okay.  Are you able to give an opinion as to
their -- their bills, given that you regularly practice
out of there?

A.   Yeah.  That's a -- like, a hospital surgery center,
so that looks pretty much customary from the current
Victoria Wage Index.

Q.   Okay.  And so Zafa Pharmacy, in your opinion, was
the care provided by Zafa Pharmacy necessary to treat
the injury Ms. Valladares sustained at Walmart on
January 1st of 2024?

          MS. PATTERSON:  Objection.  Scope.

          THE WITNESS:  I -- I don't know specifically
what she got, so I'm not really sure what she got from
the pharmacy.  She was getting some topical agents.  I
don't know what the current base guideline is.  I can't
tell you that for the pharmacy.  But I can say that she
did get medications that did help her.

BY MR. ANDERS:

Q.   Okay.  So down here, in your opinion, was the care
provided by Texas Spine and Neurosurgery Center
necessary to treat the injury Ms. Valladares sustained



the opinions you held at the time of care or the opinions that are relevant to Ms. Valladares' treatment, can I find those opinions within Ms. Valladares' chart?

A.    I -- I don't understand the question.  Like what you would be able to see?  Like that's what I'm recommending, my next treatment option?

Q.    Correct.

A.    Yeah.  It'd be in her chart.

Q.    Okay.  And so the document that I've received today called -- well, there's two.  I'm not really sure the difference between the two.  I haven't had a lot of time to study them.  One is called Life Place for 57 years. One is called Life Plan for 57 years.  Are either of these documents found within Plaintiff's chart?

A.    No, I did not put that in the chart.  I was just kind of like estimating.  If you see there's two different numbers, so I was doing on a best case scenario, worst case scenario this is what she'll need. Like a lifetime -- like, you know, based on what I think how long her chronic treatment will be.  I -- I can't guarantee what's going to happen with her.

So based on what I've treated, I kind of created a forward plan for her.  So if you look at it, if -- there's a range from 700 to 1.4, it just -- just depends on what the reimbursement is, where a facility she goes



EXHIBIT C

to.  Let's say she gets a stimulator implant at a hospital.  It's going to be a lot more costly than doing it at a surgery center.  I'll just give you an example, right?  If she gets a pain pump, you can see the -- the -- the distribution is from 99,000 to possibly 75,000.  It's just there -- there's a range.  So I just kind of created a range based on what my experience is. I've been doing this for like 15 plus years.  So I've just seen very different numbers on patient's EOB.  So I just kind of like created a -- a generic range.

Q.   Sure.  And this generic range you've created is a new analysis that you have just as of yesterday, correct?

A.   Yes.

Q.   Okay.  None of that analysis was done for the medical treatment of Plaintiff.  It was for litigation, correct?

A.   Well, I --

         MR. ANDERS:  Objection.

         THE WITNESS:  -- wanted to -- well, look.  I wanted to know like what she's future wise because she's still getting treatment.  She was continuing to get treatment.  So every time I evaluate her, I don't do it based on that analysis I made.  I base it on what -- what her -- I guess her -- what's the best way to



EXHIBIT C

for like looking at the patient's chart and how much more treatment she's going to need.

BY MS. PATTERSON:

Q.    Okay.  Do you intend to be her doctor for the next 57 years?

A.    No, she's 57 years.  I hope she doesn't live to be 107.

Q.    Oh, so you're not saying that's her life expectancy, you're saying that's her --

A.    No, she's 57.  I'm basing on let's say her life expectancy is 25 years from now.  So she's currently 57.

Q.    Is 25 years from now being her life expectancy based in anything other than just a general estimate?

A.    Yeah.  It's a general estimate based on what she's a female.  But with her medical, it's just -- it's just a general estimate.

Q.    Okay.  Have you received any documents or information from Plaintiff's attorney?

A.    Other than the medical records and what else, MRIs and stuff.  Yeah, just the medical records.  I want to say the surgeon's notes.  And, well, I don't even know some other stuff.  I have no idea.

Q.    So the materials you've received, it was my understanding that the documents and medical records you reviewed yesterday were your own.  Have you reviewed



EXHIBIT C

more than just your own medical records?

A.   I did look at the patient's therapy notes and chiropractic notes and some other stuff.  I can't remember.  It's just -- it's -- it's a folder of a bunch of records.  But I looked at mine and then I looked at the therapy notes.  I looked at some MRI reports that were from other places.  I did see the neurosurgeon's report.  I'm trying to see what else I saw.  I think -- I just didn't really have much time other than look at those because I wanted to look at the op-note for her surgery and what she did and stuff.

Q.   When did you receive those documents, yesterday?

A.   Like this morning.

Q.   Oh, okay.  Who sent you the documents?

A.   The -- Mr. Evans -- Mr. Anders.  Sorry.

Q.   Were you compensated for your time in reviewing those documents?

A.   No.

Q.   And are you aware of what your compensation rate even is?

A.   I just know I have a depo rate.  I don't know what that is.  I -- my -- my manager could tell you that. Usually it depends --

Q.   Okay.

A.   -- because I have to cancel my clinic and I have to



EXHIBIT C

intend to testify as to anything other than that, Plaintiff's injuries or the introduction of business records?

A.   I'm -- I'm just --

MR. ANDERS:  Objection.

THE WITNESS:  -- going to testify what I have, what I did, what treatment I offered her, and what we did.  What I -- what my opinion is on what she responded to.

BY MS. PATTERSON:

Q.   Okay.  And throughout the course of your deposition today, I've kept note of some of the opinions that you have offered, so I'll list those out.

A.   Okay.

Q.   And you can tell me if they are opinions you intend to offer at trial, okay?

A.   Okay.

Q.   Do you intend to offer opinions related to the causation or what caused Plaintiff's injury?

A.   Yes.

Q.   Do you intend to offer opinions related to the biomechanics or the forces that were upon Plaintiff's neck at the time the incident happened?

A.   Yes.

Q.   Do you intend to offer opinions about the



EXHIBIT C

permanency of Plaintiff's injury or pain?

A.    Yes.  I can do the prognosis, yes.

Q.    Do you intend to offer opinions about future care costs or needs of Plaintiff?

A.    Yes, I can offer that.  There's no guarantee that's what the patient's going to need, but I can offer what my opinion is on that, yes.

Q.    Do you intend to offer opinions related to disability or impairment ratings of Plaintiff?

A.    I can't determine that unless I continue to see the patient and see how she does.  She's only been seeing us for this injury about a year and a half.

Q.    Do you intend to offer opinions relating to the reasonableness of billing of other medical providers?

A.    I cannot opinion on that.

Q.    Do you intend to offer opinions related to the reasonableness of medical treatment provided by other providers?

A.    I cannot.

Q.    Okay.  Many of those opinions -- and hold on.  Let me check my notes.  I think I wrote down a couple more.

Do you intend to offer opinions relating to the quality and enjoyment of life of Plaintiff?

A.    I can do it based on my clinical exam and my evaluation of her treatment.



EXHIBIT C

Q.   Do you intend to offer opinions related to Plaintiff's activities of daily living, or ADLs?

A.   Based on my evaluation of her treatment, yes.

Q.   Okay.  And do you intend to offer opinions related to the vocational capabilities or job functions Plaintiff is able to perform?

A.   So yes, partially, based on what I am treating her for.  So I can say what she can and cannot do with her current limitations of her treatment.  So I can comment on what she can and cannot do.  I have to do that sometimes for patients.

Q.   Okay.  And is it your opinion that all of these opinions fall within testimony regarding plaintiff's injuries?

A.   Yes.

Q.   Is it your opinion that all of those opinions are part of the diagnosis and treatment of Plaintiff?

A.   That I'm currently diagnosing and treating, yes.

Q.   What do you mean when you say that you're currently diagnosing and treating?

A.   Well, are you asking me like what my opinion is and based on her other issues?  Or what I'm just treating her for her -- her issues?  Like I don't know what other treatment she's getting, like depression, anxiety.  Only what I'm treating her.



EXHIBIT C

Q.   Okay.  Well, what I want to know is, you know, how does an opinion relating to the biomechanics or the force of the bins falling on her related to her treatment that you've provided?

A.   Like, can I give my opinion on that?

Q.   You've already said you're going to give your opinion on it.

A.   Yeah.

Q.   So -- so how is that part of her diagnosis and treatment?

A.   Based on how her response to treatment and how her examination is.

Q.   The causation -- your opinions relating to causation are related to her response to treatment?

A.   Yeah, because she didn't have any pain before this injury.

Q.   Okay.  Your opinions related to future care costs are related in your opinion to your treatment of claimant, is that -- or of Plaintiff; is that correct? Based on --

A.   Yeah.  Based on --

Q.   -- injuries?

A.   -- my treatment and based what she's had treatment. Like she's had neck surgery.  So I see patients with neck surgery do great.  Some people don't.  She's still



EXHIBIT C

seeing me after neck surgery.

Q.   Okay.  And since those are opinions that you say are based on your treatment, can all of these opinions that you intend to offer be found in Plaintiff's medical records?

A.   Yes.

Q.   Okay.  And if they're not found within her medical records that you've created, then they aren't related to the diagnosis or treatment of Plaintiff, correct?

A.   Well, I don't understand what you mean, though. Like, what would you be able to find in the medical records?  Like what future she needs -- what future treatment she needs?  I can't determine that.

Q.   You can't determine that?

A.   I mean, I can't determine that like today she's going to need ten years of treatment.  I don't know. I'm just basing on what she's currently responded to and what she's doing.  I guess --

Q.   Okay.

A.   -- but if you're asking me is it going to be in my medical records that she's going to need ten years worth of treatment, I didn't write that in my records if that's what you're asking.

Q.   Right.  Right.  That is what I'm asking.

A.   Yeah.



800.211.DEPO (3376)
EsquireSolutions.com

EXHIBIT C

DR. MOBEEN CHOUDHRI                                          August 05, 2025
VALLADARES V. WAL-MART STORES TX                                          75

Q.   So those things like the -- the documents you produced today, are outside of her medical records, correct?

A.   Yes.

Q.   When did you create the life care plans?  Was it this morning?

A.   I just -- yeah, I think so.  It was like today I was -- when I was looking in her, like treatment she's had.

Q.   What methodology did you use for each of your opinions about her future treatment needs?

A.   So it's just based on how she responded to treatment and how -- what I've seen in my previous treatment, like how people do and -- after neck surgery because I see lots of people who have had neck surgery. And there -- she's not 100 percent even after her neck surgery.  She's still having a lot of axial pain, she's still having a lot of spasms.  So I did it based on what I -- with my experience and my current guidelines what I've seen with other patients.  So it's more my clinical knowledge and it's also my experience of what I see with patients who have had treatment who don't see me after neck surgery who still continue to see after neck surgery.  So based on the kind of -- the pathway she's going, she's going to be a chronic pain patient.



EXHIBIT C

might need medications long-term or not.  I didn't write anything about therapy, which I didn't put in the life care plan because I don't know what therapy costs.  I don't do therapy.  So I didn't put anything in her life care plan.  I didn't put medications in her life care plan.  I just put the procedures, the bare minimum which I have done for her.

Q.   Okay.

A.   (inaudible).

Q.   And then you also mentioned --

A.   Huh?

Q.   Sorry.  I didn't mean to cut you off.

A.   I also mentioned what she might -- might need in the future.  And with my experience I have had patients who have had neck and back surgery who require a pain pump, who require a stimulator.  She might not require any of that, but that's kind of what my estimation is.

Q.   Okay.  Yeah, in fact you said -- I wrote down a couple of things you said.  You said the pain pump would be "worst case scenario."  Is that right?

A.   Correct.

Q.   And you said, "In terms of the spinal cord stimulator, I don't know if she will need it or not." Right?

A.   Yes.



EXHIBIT C

Q.   Okay.  You also mentioned that the spinal cord stimulator is something you recommend for patients with opioid induced hyperalgesia; is that correct?

A.   No, I did not say that.  I said the patients who have neuropathic pain, a spinal cord stimulator is really good for that.  I said she might need a pain pump if she's requiring more and more pain medicine and she's getting opiate induced hyperalgesia.  That's more of a pain pump -- the intrathecal pump.  Yeah.

Q.   Okay.  Maybe I got those two confused.

A.   That's all right.

Q.   You said that you usually don't do numbers and that it was your staff that pulled the numbers; is that correct?

A.   Yeah.  I have a -- so I have an in-house billing so I just ask my billing --

Q.   Okay.

A.   -- hey, what do you think this costs?  And that's kind of what they said.  I -- I try to just do the clinical part of it mostly.  But I do have a department that is available to me, so I just asked them that.

Q.   Okay.  But then after saying all those things, you also said in response to a question from Mr. Anders that these futures you've listed on the life care plan are "necessary" to treat Plaintiff.



EXHIBIT C

A.    I think they'll be necessary if she continues to get the treatment that she's getting, if she's had a big fusion.  How much of it is going to be necessary?  It could be -- it could be one or two or it could be all of them.  I'm just doing it based on what I see her projected treatment, her response to the treatment she's getting.  I have to do it based on what I feel like is clinically indicated.  I -- I can't -- I can't determine the future.  I think that's what she will need medically necessary based on what she's responding to.  Even after having a very involved surgery she's still requiring pain management, so that's kind of what my estimation is.

Q.    Okay.  And at the beginning of your depo you agreed to limit your opinions to a reasonable degree of medical probability.  Are you confident in the opinions you've provided today and that they are limited to a reasonable degree of medical probability?

A.    Yes.

Q.    Okay.  You were disclosed as a treating physician.  Is that your understanding?

A.    Yes.

Q.    You did not provide a written report and you were not retained as a retained expert in this case, correct?

A.    I am retained as a treating physician, I think.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

EXHIBIT C

Yes.

Q.   Okay.  And because of that you also did not provide your qualifications, your prior testimony, your rate of compensation, or any other details like that, correct?

A.   I don't know what that means.

Q.   Right.  You didn't provide it though, correct?

A.   What didn't I provide?

Q.   You have never provided your -- until today, until right now, you never provided a CV, correct?

A.   Well, I gave my CV to the -- to -- to do deposition.  But I -- what do you mean, like until when?

Q.   Until -- until today or until maybe yesterday when you sent it to Plaintiff's counsel?

A.   Yeah.  But that was the first time I ever actually spoke to the Plaintiff's counsel.

Q.   Right.  And to your knowledge they did not retain you as an expert in this case, correct?

A.   I think they're asking for my opinion because I'm also her treating physician.

Q.   You -- you think that?

A.   Yeah.

Q.   Okay.  Is your opinion that you're providing outside of the scope of treatment?

A.   My -- it's within the scope of my treatment.

Q.   Okay.  So you regularly provide litigation-based



opinions as part of your treatment?

A.    What does that even mean?

MR. ANDERS:  Objection.  Vague.

BY MS. PATTERSON:

Q.    As part of your treatment, in the medical records do you provide opinions for litigation?

A.    I -- I provide opinions for my clinical thing and it sometimes it's used for litigation, sometimes it's not.  I don't use that as a regular base, like a -- I'm kind of confused what you're asking. Okay.  You did not perform any biomechanical analysis of the forces involved in this incident, correct?

Biomechanical analysis.  Like -- like what?

Q.    Like testing.  Did you go to the store and do any testing?

A.    No, I didn't.

Q.    Okay.  You didn't quantify the forces or relate them to specific injuries, correct?

A.    No, I didn't.

Q.    Quantify meaning -- okay.  Did you review the complete prior medical history of Plaintiff, meaning for her entire lifetime, as it relates to back and neck injuries?

A.    Whatever the patient provided to us, because she's been seeing us since 2019.



EXHIBIT C

Q.   Okay.  So you've only -- you only have access to information for Plaintiff's records since 2019?

A.   Yeah, based on whatever the patient gives us.

Q.   Okay.  Your opinions related to billing reasonableness are not part of clinical treatment, correct?

A.   Well, I'm basing it on the fact that my clinical treatment costs this much.  So it is clinical treatment. What the billing is, it is what it is.  It's a cost to what it -- it -- it costs to do the clinical treatment.

Q.   Okay.  So your opinions related to billing reasonableness, I think what you're trying to say is that they're based on clinical treatment, but are they part of your clinical treatment?  Meaning in treating the Plaintiff you're giving her your opinions about billing reasonableness?

A.   Do I give the patient my reasoning why I'm costing her that much?

Q.   Right.  Is it part of your treatment of the Plaintiff?

A.   Well, it's just part of my treatment.  I do a treatment, I charge a cost.  I don't understand.

Q.   Okay.

A.   It's the wage index.  It's the Victoria Wage Index, whatever -- whatever it costs to do an X amount of



EXHIBIT C

procedure.  I don't understand what your question is.

Q.   Okay.  And you mentioned that earlier, the Victoria Wage Index.  What is this wage index you refer to?

A.   So it's determined what you get paid.  I can ask for a million dollars, I'm only going to get paid so much based on what is the current guidelines.  And so insurances have certain contracts with us, Medicare, whatever.  And so it's -- it's determined in this area what -- what will be paid.  I get paid differently when I'm in New York, maybe.  It's just every -- every part of the country is different.  So I -- my treatment and my bills are based on what I have created, what -- what we get reimbursed on that.  That's why I gave you that wide range because it's just based on what -- where the patient goes.  If the patient goes to the hospital, the hospital will charge them more.  If the patient comes to the clinic, it'll be a different clinic appointment. I -- I can't determine that.  So I can only -- I can only comment or I can only testify on what my bills are. I can't testify what other people's bills are.

Q.   Okay.  And do you have a copy of this Victoria Index?

A.   No, I don't.

Q.   Is it like a publication someone could find?

A.   I have no idea.



EXHIBIT C

Q.   Okay.  How do you find it to base your charges on it?

A.   I don't base my charges, I'm just kind of explaining to you what reimbursement is in different parts of the country.  So I -- I'm sure it's public data, I have no idea.  We just look at it based on whatever the public data is.  I -- I don't do billing, I just do my notes and injections.

Q.   Okay.  How do you have opinions --

A.   I ask the billing department.

Q.   -- how do you have opinions related to billing then if it's not part of your job?

A.   Well, because I ask my billing department what it pays and then that's what they tell me and that's how I know.  I have a medical degree, I don't have a billing degree. but I know what my treatment costs.  I need to know that, I'm in private practice.  That's something you -- everybody knows.

Q.   So would your billing department have access to the Victoria Wage Index?

A.   I have no idea.

Q.   Or is that what they use for reference?

A.   I have no idea.

Q.   Okay.  Do you know that trial is on December 1st in this case?



EXHIBIT C

A.    When you say opinions, like what I think she needs treatment wise?  I -- I -- I've always felt like she needed to continue treatment.

Q.    Okay.

A.    Every time I see her.

Q.    But actually listing them out on the life care plan that was created after the last time you saw her.

A.    Yes.

Q.    Okay.  Along with the opinions about causation, the forces, the biomechanical, the reasonableness of medical bills, is that an opinion you had ever expressed to Ms. Valladares during your treatment of her?

A.    When I first saw her I told her that.  I'm like yeah, you didn't have this pain before and the mechanism of action caused that pain.  There's -- there's a impact that fell on her neck.  So yeah, I expressed that to her when I first met her for the neck procedure.

Q.    Okay.

A.    Because I'm the one who initially evaluated her in March, so I did express that to her.

Q.    In March of what year?

A.    2024.

Q.    And the opinions related to the cost of future treatment, are those -- are those opinions you've ever provided to her during the course of her treatment?



EXHIBIT C

A.    It's not a discussion I usually have with patients.
I usually talk about their clinical.  I never talk about
the cost of things.

Q.    Okay.

A.    Very rarely.

Q.    Understood.

A.    Okay.

        MS. PATTERSON:  Okay.  I think that's all the
questions I have for you.  Thank you, Dr. Choudhri.  I
appreciate your time.

        THE WITNESS:  Okay.

                EXAMINATION

BY MR. ANDERS:

Q.    Just a couple of follow-ups, Doctor.

A.    Yes.

Q.    So I just want to confirm that the future medical
costs that you -- the opinion you gave as to future
medical costs in this -- in this case.  Those were based
on a reasonable degree of medical probability?

A.    Yes.

Q.    Okay.  And there was -- so -- so there was some
discussion back and forth on -- on, you know, whether or
not you were sure or -- and these things.  The -- the
standard we're going to be held to by the court is
whether or not based on a reasonable degree of medical



EXHIBIT C